Good morning and welcome to the court. We have four cases on the docket this morning. Just so the parties and lawyers know, we're going to hear the first case and take a recess to reconstitute the panel and then come back to hear the last three cases. First case on the docket is United States v. Kent. Mr. Coleman, you ready to proceed? Yes, Your Honor. Thank you. Good morning. May it please the court, my name is Lex Coleman. I represent Whitney Kent, a 27-year-old African-American mother of two children. She had zero criminal history points and was subject to an advisory guideline range of 6 to 10 months of imprisonment. Her case is based on the seizure of 89 30-milligram oxycodone tablets from an express mail on-board. I'm here today because the drug dog involved in her case can't talk. I'm also the drug dog handler who was involved in the case. I was not allowed to call him and effectively cross-examine him to talk. And then because the postal inspector who originally pulled the express mail envelope out of the mails decided that because it complied with all postal regulations, it was still suspicious. Turning to the dog, we had a search warrant in this case. And as a consequence, I had to overcome the standard review in Franks v. Delaware. To do that, though, I had to fully take advantage of the standard that applied in Florida v. Harris, which is just as Kagan put in her opinion, said, I get to put on my best case. And what I got to do starting was point out how the dog had not been bred as a drug dog, was not initially trained as one. It was bought for a retired officer's daughter going to college. Well, why is that relevant? The dog was trained to look for narcotics. They were looking for narcotics. The dog pointed to something. The fact that it found oxycodone was kind of a bonus, wasn't it? Well, no, it wasn't a bonus, Your Honor, because during that year, what's relevant, and this has been a concern throughout the district court case, the dog was trained to find, at best, four drugs. And yet, in the year leading up to this search, there were supposedly 70 canine uses, only 55 were reported turned over to us. Twelve of those found pills. And one of them where the handler especially used the dog to find pills when he knew he hadn't trained the dog to find pills. Well, they weren't looking for pills in this case, were they? But you've got 12 instances leading up to it. So your point is that that makes the dog unreliable. It's relevant to that issue, yes, sir. And what I would have cross-examined him about, had I gotten all the other material, was getting into also the handler's training, the handler's habits and practices over the years of abiding by departmental standards and regulations over how the dog was to be used, how it was supposed to be trained. The City of Charleston resisted giving us any of that, and that issue was left open at the end of the pretrial motions hearing. Is that issue before us today? Yes, sir. I would submit it is. The issue of not having sufficient materials to cross-examine? Well, it was part of not having Hackney come back. They were all together at the beginning of the hearing, and Judge Johnson acknowledged that. And really, the example I came up with preparing for this would be with this circuit's line of 404B cases. What do we say about when notice is required and when it's even required at all? We get into this intrinsic, extrinsic consideration of facts and circumstances of if they're bad acts evidence. In this case, Hackney's credibility overall, his compliance with departmental procedures, the quality of his training, all of which went to the reliability of the dog and knowing whether or not to rely on the dog, were intrinsic to our motions to suppress. Kagan says one of the main ways we can impeach the reliability of a dog when a police officer and the government trots out a signed piece of paper and says, hey, it's been certified. It's as if we're supposed to take the paper without question because this agency, which they haven't proved is a competent agency or good at qualifying dogs, signed a paper on this date for this year, the next year, the next year for $25 that the dog creates probable cause. And I understand the argument that, yeah, it's trained for something it indicated. I didn't agree with Judge Johnson's characterization of hindsight bias because the dog was doing enough things it wasn't trained to do beforehand. That's why I included our 17C application because we have the evidence of that. It wasn't just a baseless representation. The dog was doing enough irregularly before this search that it should have put everyone on notice and raised concern about, what is this dog doing? It's not trained to find pills. It's regularly finding pills. It could be, as the government wanted to argue, that there was some chemical connection to heroin. It could be the dog is cueing off the handler. The point is there's enough irregularity from how the dog is being trained that certainly the handler and the department should have been put on inquiry notice to find out, is this dog really doing what it's supposed to do or is it doing something else? That's the recklessness part of the Franks inquiry. The handler, again, who was not cross-examined. Can I ask you a question? Yes, ma'am. You said that it might have been cueing off the handler, the dog, but I thought that the way they did, am I wrong about this? I thought that the way they did the sniff, they set up the row of envelopes outside the presence of the handler so the handler wouldn't know which one. Actually, the handler would know because, think about it, they did it in the same place every time. They always did it with the same postal inspector. They took four blanks that were not in the mails or used and used them repeatedly until they deteriorated to the point they replaced them. The only thing that was different every time that dog went down a hallway and came back, again, they did it in the same place, was the new thing introduced, which was the parcel pulled out of the mails. Well, the record doesn't show that they were always in the same order, does it? The order is not going to matter. The dog is not counting sequence. The dog is discriminating smells. All right. So the new thing is always going to be the parcel introduced that they pulled out of the mail stream, even if it was out of the presence of the carrier. And, of course, he could still read, and it was addressed to the person that the handler had been discussing with the postal inspector back in the mail room. The dog could read? The dog couldn't read, but the handler walking along them with the dog could still read the letter. That's part of the cueing argument. The whole Clever Hans thing, as I understand it, it's explained the dog's senses are so much more sensitive. I don't know that I completely believe it, but I'm not a veterinarian, and I believe in the possibility of it. I may have misunderstood your arguments in your brief, but I thought that you were objecting to sort of two statements in the affidavit, and one was that the dog was sort of a trained drug dog when, in fact, the dog wasn't trained on oxycodone, and the other was that the dog had, in fact, alerted. But I thought that's all that was in front of us. It seems like now you've got a much kind of broader and more thorough argument. It was broader from the beginning with the suppression motion. Well, I guess the point is it may have been broader across, but your brief sort of narrowed the issues to the two that Judge Harris has pointed out. Well, we certainly narrowed it to the major points that got the warrant issued, which were that it was a trained dog that alerted, and, of course, the alert was what, if there was an alert, we don't even know how it alerted, was what the handler said, and we didn't get to put the handler on to attack the reliability of his training and even interpreting that or teaching the dog how to do it. Well, now, didn't the inspector, Inspector Mehal, didn't he also see something that looked like an alert? I mean, he did say, I'm not competent to say for sure that's an alert, but he saw something that looked a lot like an alert. Well, he started to and then checked himself and said, well, no, that's why we need... But he was able to describe what he saw, which was the dog, I guess, sitting down in front of the... Your Honor, as I remember that part of the record, he started to, but, again, he stopped and caught himself because he knew he was not competent and couldn't... There was definitely some thinking going on with what to say and what would open up because such a big effort was being made by the government to keep the handler out of the mix. So, again, to satisfy my burden under Franks, I had to do everything I felt that was required and allowed by Florida v. Harris. And it's not a question of the probable cause standard here for the warrant. It's what was either recklessly or even falsely represented in that affidavit. And one concern about how the arguments have all been directed by the briefing is it because this incident report in the record at 119, it's 11 lines of text and it was created a month after this search. The government and the district court, to a degree, said, you know, it happened afterward. How could the postal inspector know about it? It's evidence that this handler will be dishonest. It's not the only incident he was dishonest, and that was developing the historical material we were trying to get from Charleston to show that through his habits and practices that he was not reliable and not fully honest in filling out the paperwork. In fact, the year-end form that was provided at 88 and also 592 in the record, it is titled End of Month Report for December of 2012, but it actually goes the whole year, said he did 70 reports and only 55 were produced through any of the discoveries. So even there, the record-keeping was inconsistent and irregular. So, again, I didn't get to finish showing what I needed to show to satisfy Frank's, and it was because I didn't have this other material to effectively impeach the handler, and for the court at that point, that's where we were cut off, and that's why I briefed after the hearing. That was my concern with Judge Johnston, that he was going to rule on this without going further and giving this material and letting us finish. Mr. White, who was the original owner of the dog, was put on at the end of the day. It was between 5 and 5.30 when he was finished, and I tried to make clear on the record there was more to do. Concerned that I may not have done that clearly enough, we filed the motion afterward. Again, going to that, if I had finished that, I feel confident I would have been able to have carried my burden under Florida v. Harris. May I ask you a question about the original detention of the package? Yes, ma'am. So one of the things that the district court actually didn't rely on, but maybe could have, was the fact that, I guess it was the dog handler recognized Kent's name from a prior investigation. Is that something, I mean, are you contesting that that is true, that Kent had, in fact, been involved in prior investigations? And I know she was in an apartment across the hall from where a search warrant was executed two years before, which is what I would develop if Hackney had been on the stand to show that his representation or inference that she was more involved at some point was less than it was. Well, did you proffer that to the judge? Not at the point, Your Honor. I was trying not to. Before we got to here, I was... Why not stick your hand? Exactly, which is what I represented in my 17C. I still think if we go back, I've got one shot with this officer. I've already had to give up a lot that I had, but I feel confident. See, after my client pled and was sentenced in this case, we finally got the Charleston Police Department Operations Manual and the nine pages that control canine officers and did it at the time in 2012. And believe me, from some of what we do have, I could have very effectively shown how little he complied with the requirements  I also have video from another case where the dog's alert in that case was completely different than what was described in this case. So now that's out and we know, but I've got to get back to do something with it. And right now I've got a 27-year-old woman with a felony drug conviction when they pulled a package out of a stream of mails that complied with all applicable postal regulations with her name on it from New Jersey. If you take Hackney, that Hackney really is not relevant. And on the relevancy point, I don't mean to go off on a quick tangent. I'm watching my time. All these arguments about the handler's not relevant. Have the handler signing the affidavit instead of the postal inspector. Of course, we wouldn't even be debating or briefing the relevancy of what the handler said. And we look at Leon and Frank's. They both acknowledge you can't have somebody misrepresenting, recklessly representing, and passing it through an ignorant individual to sign an affidavit. So all these arguments about it's only got to be down to what Mehal knew. It's all got to be down to the, oh, this thing where he got caught in an instant report a month after this happened. It isn't all about what Mehal knew. It's about what was... There's a collective knowledge here of all the officers involved. And Hackney certainly understood the limitations and the extent or lack of extent of training he and the dog had, what the dog was doing, and really from several of the finds in 2012, Mehal was involved. Where the dog was finding stuff it wasn't trained to do. Mehal may not have known. The inspector may not have known that the dog was not trained for pills. But the handler certainly knew she wasn't. Mr. Coleman, you've been spending a lot of time on this Frank's issue, and I'm not here to dictate to you how to present your case to the court. But I'm wondering, other than saying that the package complied with all postal regulations, what else is there about the probable cause analysis in this case that you think is most problematic for the government? Like, for example, I mean, one of the issues in this case is that there was a discrepancy in the return address, which the government relied on to show that there might be something amiss here. Is it your position that that alone simply is not enough, along with the other... That alone, if we look at Judge Shedd's opinion, and also Florida v. Harris, there's a lot of stress on common sense with the probable cause standard. Common sense tells us that you've got a service you solicit through your cell phone, his BlackBerry, that has an express provision on it. These are public records verified. Don't rely on this. They didn't say it was a fictitious address. They said we can't associate this name with that address. That's all. That could be a friend living with a family, a relation that was divorced, staying there. It could have been someone legitimately using it. It didn't break postal regulations. What if he used a phone book? What if a phone book still existed and he used a phone book? Would that have been better? Would that have been more reliable? The way it's done now, I think some effort to verify. I'm not here to dictate or ask the court even to dictate, here's what they should have done, because that was a problem the Florida Supreme Court got into. I guess the question is all these things that supply addresses have some level of uncertainty to them, and the fact that this has one doesn't necessarily mean it's something they can't rely on, does it? The question is whether it's reasonable to rely on it when they're flat out saying don't rely on it. No, there's not 100 percent certainty. My time is about to go, so if I speed up my talking. Well, your time is up, so you've reserved some time for us. Yes, sir, I have. Thank you. Mr. Hanks. Good morning. May it please the court. My name is Josh Hanks. I'm an assistant U.S. attorney in the Southern District of West Virginia in the Charleston office. This case, as the court has already pointed out, really involves only two issues. One is whether there was reasonable suspicion for Inspector Mehal to examine the envelope and subject it to a dog sniff. And secondly, under the Franks challenge, is whether there was false information in the search warrant. There was a lot of discussion just now about the dog handler and all that. That has permeated this case, but it has always been irrelevant, has always been a red herring. This is simply about an officer, inspector at the post office, who went through the profiling techniques used to identify suspicious mailing packages. He identified one on a particular day of all the hundreds that went through, subjected it to a dog sniff by a trained narcotics dog. That's not in dispute. The fact the dog was trained is not in dispute. Once the dog alerted, Inspector Mehal went to the federal magistrate, put in the facts, obtained the search warrant, and lo and behold, when they opened the package, there in fact were drugs. Thanks. Except for the discrepancy in the return address label, at least at first blush, it doesn't seem that any of these other factors that the officer relied on appear particularly incriminating. That's true. As the court is well aware, it's a totality of circumstances to establish reasonable suspicion. Even in his own testimony, Mehal said, for example, the handwritten label. It's not suspicious, but it brings it out of the norm, I think is what he said. Each one of these things that he looked at is a funneling technique. He said that the handwritten label indicates person-to-person mail, which is unusual for the expense and nature of express mail envelopes. That's typically business. Well, I don't know. I've done that. Certainly. And to my knowledge, I'm not a criminal. Certainly. You're overselling yourself. The presence of the handwritten label by itself isn't necessarily suspicious, but what it does, it eliminates the vast majority of the envelopes that he looks at. But does it do it in a way that suggests nefarious activity? Not at that point. He even said it was not at that point, because once he has a handwritten label, he then looks to see whether it involves business or commercial transactions and disregards all of those. He is looking for person-to-person mailings, which he said is more commonly associated with drug traffickers than commercial. Even that isn't by itself suspicious. It just simply eliminates the vast majority of the mail coming through. And are we to simply accept that as based on the officer's training and experience, or was there some empirical evidence that supports that, or is it just common sense? It's a little of all of that. The officer said it was based on his training and experience, but many of the opinions cited by the district court in other circuits, other district opinions, indicate that this idea of the profile itself, handwritten labels, all the things that they're looking at are acceptable techniques to determine or ascertain what package may be. We're talking about reasonable suspicion. All that he has to do is establish a justification for removing it from the table or the belt. This was a table instead of a belt line. But to remove it for the purpose of subjecting it to a dog snap. But reasonable suspicion is reasonable suspicion, right? If we say this is reasonable suspicion, I assume they also could have probably Terry stopped her as she came to pick up her mail, right? Certainly. Right. Once we've said this is reasonable suspicion, here it was just to detain the envelope, but it would carry, you know, in other contexts it would allow the police to do more. Possibly, but I think that these are so fact specific for the purpose of an interdiction activity for mail only. But, I mean, wouldn't you agree, like, if this is reasonable suspicion, they could have stopped or seized her when she came to pick up the envelope, right? Based solely on the... If there's reasonable suspicion that she's transmitting drugs through... They could have stopped and spoken with her. I don't think that they would have been entitled to open the package, for example. No, I understand, but they could have seized her. Could they have frisked her because they have reasonable suspicion that she's transmitting drugs through the service? I think that they would probably have had to have reasonable suspicion that she was dangerous in some way to... And you don't think that would follow from the fact that she's selling drugs? If she had showed up at the post office, I would hesitate to suggest that any time someone shows up at the post office to pick up a package that has these characteristics, that they would automatically be deemed dangerous. It may be that if there was something about the person's history that the officers knew, but I'm not asking the court to make that sort of a rule. The problem with the theory is that nothing plus nothing equals nothing, and I don't see how this stuff narrows anything. I mean, it comes from a source state. Well, the source states that he listed contain a third of the population of the country. And likewise would... If you extrapolate, that would likely contain a third of the drug traffickers in the country. Each of these things are simply... Because that doesn't make it likely that this one is. I mean, my guess is that people in New York and New Jersey and Texas send stuff to West Virginia all the time. Well, and if this were a matter of justifying opening the package, I think that that would be a more concerning question. But this is simply to justify setting it up for a dog to walk past. Well, the thing that he really needed was Hackney's statement that this lady is already being investigated for drugs, so she has a cloud of suspicion around her already. Isn't that right? I don't believe so. That would certainly help, grains of sand on the scale of reasonable suspicion, to be sure. Well, if you rely on that, doesn't that bring us back to the question of why can't they ask Hackney some questions? Well, the government made a decision not to put him on as a witness in the government's case. I understand that. Couldn't the other side call it? The district court determined that it did not need that particular piece of evidence to find reasonable suspicion. That's sort of the issue before the court, isn't it, is whether he had a right to call Hackney. It is, and the court would have to find that that was an abuse of the district court's discretion to do so. That would be completely irrational for the court to decide not to call Hackney under these circumstances. This, again, is we're talking about the absolute lowest standard, the lowest level of law enforcement involvement is reasonable suspicion. That's it. That's all that has to be justified here to expose, to then run it past the dog. If there had not been the misaddress on the return label, would he have had reasonable suspicion? I think that would have become very much more problematic at that point. Is that the most important factor? I think that it is. Again, I always think of it as grains of sand on the scale. The courts have been hesitant. I promise you don't have a lot of grains here. Sure, that's true. Even in reviewing the courts that have looked at this question, they tend to range from between three and seven of the factors. Almost all of them have handwritten labels. Almost all of them are person-to-person. Almost all of them are source states, and then it begins to diverge. Then you'll have a misidentified return address and sender. You'll have fictitious information. You'll have ongoing investigations. In this case, we have at least five of the things. Other courts have upheld at least as few as three. I looked at those other cases, and it did seem to me, even just based on the district court's own parentheticals, which were very candid, that at least in most of those cases, there was more than we had here. There was weird taping, or they were mailed from a different zip code than the one on the return address, or they were mailed to a hotel room. It seemed like even in the district court's own recounting of the case law, there was mostly a little more than we have here. Would you disagree? There often are. Each case is so fact-specific. Again, the Fourth Circuit has not spoken to this issue. That was the glaring thing to me from the judges' citations. But it seems that the idea that these profile characteristics are used over and over again seems to make them somewhat non-controversial. There are really no courts going counter to the idea that the postal inspectors have a legitimate profile built that is, again, simply is used to establish reasonable suspicion. We're not asking for permission to open up packages based on this. These are simply just to run it past the door. That's all. Now with regard to, again, the issue of reasonable suspicion and probable cause are two of the lowest levels of burden of proof for the government. Frank's, on the other hand, is a very high burden, and that's the defendant's burden. And that's the other issue here. And the defendant was unable, by proffer, testimony, or otherwise, to even identify false statements in the search warrant. The two statements that were identified were one, that the dog was trained, and secondly, that the dog alerted. There's absolutely no reason to believe the dog wasn't trained. Did they present evidence at the hearing about the dogs possibly cueing on Hackney's conduct? Inspector Mehal was cross-examined to some extent on that, but he was the only witness who was present for the dog. Well, but was there a suggestion that the dog was cueing on other occasions? Not from my recollection of the record, no. In fact, the district court mentioned candidly its familiarity with this handler team. Detective Hackney has now this unfortunate thing going forward from where he wrote this report that had false information in it. But there's been no doubt whatsoever that the reliability of this dog. We continue to use the dog. The dog was used last week, as a matter of fact. This is a very reliable dog. There's been absolutely no reason to doubt the reliability of this dog. And so you have to have, A, the dog is not trained, and B, that the dog did not alert. And those were the two statements that were identified. There's absolutely nothing in the record. No matter what Hackney would say, he could be the worst liar to ever walk into the courtroom. And there's nothing that he would say, even if he were called, that would call into question the fact that the dog is trained, because that's now been established by its records, and that the dog alerted, which is corroborated by, as Your Honor pointed out, Inspector Meehaw observed the dog indicate, even though he was careful not to claim to be an expert in that field. He did see the dog's behavior, which corroborated the statement, the dog alert. If the court has no further questions, I'll give the rest. All right, thank you. Thanks. Thank you. Did you present any evidence about cueing to the district judge? Came in through the expert, and also came in through the records, even with Myron White. Did you have those records at that time? I had some of the records. We had the records from when the dog started training through Hackney's initial program with the original owner of the dog. And the dog was, in the narratives, looking back over its shoulder at the handler, which, at least Mr. Nicely testified, was evidence of cueing, and the dog looking for some response from the handler to either reinforce or prompt it to do something else. So you had the fabricated report, the fact that they used the envelopes over and over, the fact that the dog was not trained with controlled negatives, the fact that Peanuts looked back at Hackney sometimes for alerting or might have, and the fact that there was no discrimination training. We had that, and we had the original teacher of the team. Hackney and Peanut were together the first time as a handler and a dog. And Mr. White trained them, and he repeatedly remarked from his own records from 2008, 2009, and early 2012 how the dog and Hackney were not doing that well. There is no other evidence of the dogs training other than these annual certifications from the West Virginia Police Canine Association. And the two witnesses from that showed they didn't even understand how their own organization worked, which was disturbing, where they claimed to be training 75% to 85% of the police canines that are being used in the state of West Virginia. I disagree that there's no dispute about the reliability of the dog. I wasn't allowed to finish going ahead attacking it. And the fact the government wants to keep using it, if the dog's 100% in the field, I understand why. And if we can't get Hackney to attack and attest the veracity of his statements or his training, as long as the court is issuing search warrants based on it and they're finding drugs, why wouldn't they use them? Foster and Giovanni have been two recent decisions of this court where the grains of sand have applied to reasonable suspicion and to probable cause. And they all, both, were quite critical of the ad hoc pointing to innocent facts, using the totality of the circumstances argument, bunching them together and saying, hey, they clear it. Was Giovanni a car search? They both were car searches. Yes, sir. Yes, sir. They're distinguishable facts on that, but the government had made the point that these are the lowest standards. We're not suggesting any change in the standards. We're saying here they shouldn't have applied to get what we got. The package was pulled out, Your Honor, it wasn't just complying with postal regulations. It had a handwritten form. Person-to-person mailing is not against the law. And the standard, a legitimate profile, the earlier cases cited by the district court, were dealing with an agency-wide policy that they had obtained at one point. This officer was developing his own and acknowledged it would differ from officer to officer and that it would frequently change. Even the handler in this case, in a different case, I had cross-examined him on a transcript from that and indicated that New Jersey was not a source state for what they ultimately found. And with that, and more or less what I thought I got out of it going across, was so pretty much your profile changes on how you want it to. And that's kind of how it's being applied. We're seeing these vague, grouping together, as you've noted, somewhat lacking profiles with a general search warrant of a dog that we're not allowed to effectively question and attack because we have prior case law saying that's enough for probable cause. And the key is what's in the Kabbalist case. A trained narcotics dog, by law, according to our Supreme Court, is supposedly one that will not discover non-contraband items and will only find contraband items. That's what Kabbalist said and what we had gone with. That's what Mr. Nicely was trying to regurgitate. The dog did find contraband items. I don't understand how that helps you. The dog found contraband items. The dog found legitimate pills that were being shipped in an illegitimate way without a prescription. They were not the same as street drugs or heroin or L-1. You gave me the definition of contraband, I think. I beg your pardon? You just gave me the definition of contraband. Yes, I did, but I guess I'm interpreting that in the context of Will Reynolds' testimony of why it was so important they didn't train dogs on pills because of the binders and everything that are used in legitimate things, non-controlled substances like vitamins, that the dogs would be frequently alerting one and why they don't even train them for that. Or so they claim with this organization that says it's a trained narcotics dog every year so it could be used in West Virginia. Again, the training is a dispute. I don't agree that it's not. And as we go down, Your Honors, with the other cases, there was a whole lot more than we had here. And they diverted it out of the stream of the mail and they kept it out of the stream of mail. It wasn't delivered on the time it was intended and it wasn't delivered at that location. All right, thank you very much. Thank you. Thank you, counsel, for your arguments. The court will take a recess, reconstitute panels, and return. We'll step down and recount. This honorable court will take a brief recess.
judges: Albert Diaz, Pamela A. Harris, John A. Gibney, Jr.